D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                            Plaintiff,

-against-

EAST DELTA RESOURCES CORP., VICTOR SUN,
DAVID AMSEL, and MAYER AMSEL,

                            Defendants.
-----------------------------------------------------------X

**MEMORANDUM OF DECISION**

10-CV-310 (SJF)(WDW)

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ AUG 3 1 2012 ★

LONG ISLAND OFFICE

FEUERSTEIN, United States District Judge:

On January 26, 2010, plaintiff United States Securities and Exchange Commission ("plaintiff" or "SEC") commenced this action against defendants East Delta Resources Corporation ("East Delta"), Victor Sun ("Sun"), David Amsel ("David" or "David Amsel"), and Mayer Amsel ("Mayer" or "Mayer Amsel"), alleging, inter alia, violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5; and Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c). The complaint sought permanent injunctive relief, disgorgement, civil penalties, and a permanent bar on David Amsel and Sun from serving as officers or directors of a publicly held company. [Docket Entry No. 1].[1]

---

[1] During the course of the litigation, plaintiff reached settlements with, and voluntarily discontinued the action as against, defendants East Delta and Sun. [Docket Entry Nos. 37, 39, 43, 47].

1

By order dated March 22, 2011, the Court granted plaintiff's motion for summary judgment against remaining defendants David and Mayer Amsel, except with respect to those claims arising under Sections 5(a) and 5(c) of the Securities Act. A bench trial was subsequently held for the purpose of adjudicating those remaining claims. David Amsel failed to appear for trial, and a default judgment was entered against him. [Docket Entry Nos. 93, 94]

Before the Court are: (1) the SEC's remaining Section 5 claim against defendant Mayer Amsel; and (2) the SEC's application for disgorgement, prejudgment interest, and civil monetary penalties against both David and Mayer Amsel, as well as the SEC's application for a permanent bar on David Amsel from serving as officer or director of a publicly traded company. The following constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, as well as the Court's order as to the SEC's application for the above-referenced remedies and penalties.

I. Mayer Amsel's Liability Under Section 5: Findings of Fact

East Delta

1. East Delta was a so-called "penny stock" company that purported to own and/or operate gold and other mineral mining properties in China. See Pre-Trial Order, Agreed Fact No. 1 [Docket Entry No. 53].

2. East Delta was a publicly traded company and its common stock was registered with the SEC. Id. at No. 1-2.

3. On August 30, 2004, East Delta filed a Form S-8 registration statement with the SEC. Pl.

Ex. 146.

### Mayer Amsel's Role at East Delta

4. A consulting agreement (the "Agreement") between East Delta and Mayer Amsel was filed with East Delta's August 30, 2004 S-8 registration statement. Pl. Ex. 146.

5. The Agreement stated that Mayer would serve as a consultant to East Delta from on or about August 26, 2004 through on or about August 26, 2006. Id. at Article 4.1. As compensation for his services, Mayer was to be issued one million (1,000,000) shares of East Delta common stock, valued at $250,000.00. Id. at Article 6.1.

6. The Agreement identified Mayer's responsibilities. Under the terms of the Agreement, Mayer was to "immediately commence an analysis of the financial, engineering and mining experiences of all Canadian and American mining entities operating in China and issue recommendations as to those that have most potential to have an interest to either partner, affiliate, provide engineering services and/or invest in [East Delta's] projects." Id. at Article 3.1.

7. Under the terms of the Agreement, Mayer was also to: "arrange and organize meetings and discussions with potential joint ventures partners, property options and mergers/acquisitions candidates"; "assist [East Delta] in the preparation and accumulation of all documents related to the due diligence, to any agreements or contracts, and any required filings with the relevant regulatory bodies needed as a consequence of this Agreement"; and "be responsible for hiring, paying and supervising and additional personnel and/or any other expenses . . . required to execute his responsibilities." Id. at

Article 3.2-3.4.

8. The Agreement stated that Mayer had "developed an extensive network and knowledge of businessmen in North America, including but not limited to, mining and exploration entrepreneurs . . . ." Id.

9. Mayer testified that, prior to his association with East Delta, he had no experience working with mining companies. Transcript of Bench Trial, March 28, 2011 ("Trial Trans.") at 111:22-24.

10. Mayer testified that he did not produce any written work product in connection with his retention as a consultant under the Agreement. Id. at 116:8-9.

11. David Bikerman ("Bikerman"), who served as President of East Delta between the fall of 2006 and July 25, 2007, testified that to his knowledge, Mayer never prepared "an analysis of the financial, engineering and mining experiences of all Canadian and American mining entities operating in China." Id. at 95:3-10.

12. Bikerman testified that he never saw any work product created by Mayer. Id. at 95:16-19.

13. Mayer testified that, from late 2004 through 2006, his activities at East Delta focused on "promotion." Id. at 118:7-16.

14. Mayer testified that he attempted to raise money on behalf of East Delta throughout the time that he was involved with the company. Id. at 118:17-20.

15. At his deposition, Mayer testified: "In general I was always looking for people to buy the [East Delta] stock." Pl. Ex. 292 at 121:11-12.

16. Bikerman testified that he "did not understand [Mayer] to have a role within the company." Trial Trans. at 93:10-16.

17. Bikerman testified that Mayer's role was "focused on getting people interested investing [sic] in the company." Id. at 94:2-5.

18. At his deposition, Mayer testified that he brought various individuals to East Delta to assist in the management of the company. See Pl. Ex. 292 at 163:9-21.

19. Mayer testified that a "friend" named Gary Brotkin introduced him to Harry Hopmeyer ("Hopmeyer"), who later became a consultant with East Delta. Id. at 163:24-164:11; Trial Trans. at 112:19-21. Hopmeyer was then responsible for bringing Bikerman and an individual named Ian Park to the company. Pl. Ex. 292 at 163:24-25.

20. Mayer further testified that through the network of another "friend," an individual named Felix Furst was introduced to, and later became affiliated with, East Delta. Id. at 165:6-13.

Mayer Amsel's Trading and Promotional Activities

21. Defendants Mayer Amsel and David Amsel are brothers. Docket Entry No. 7 at ¶ 13.

22. Both Mayer and David bought and sold East Delta shares at various times from 2004 to 2006. Pl. Exs. 184, 274, 275, 277, 284, 301, 302.

23. On or about August 30, 2004, Mayer sent a letter to East Delta's transfer agent. Pl. Ex. 18.

24. In the letter, Mayer requested that one hundred fifty thousand (150,000) of the one million (1,000,000) East Delta shares he had received in accordance with the Agreement be transferred to Chris Knapp ("Knapp"). Id.

25. Knapp was a promoter of East Delta stock. See Pl. Ex. 292 at 45:16-46:17.

5

26. Mayer testified that he transferred the shares to Knapp as compensation for Knapp's "services" of "attract[ing] buying in the stock." Id. at 46:12-17.

27. In the same letter, Mayer requested that two hundred fifty thousand (250,000) shares of the one million (1,000,000) East Delta shares he had received be transferred to David. Pl. Ex. 18.

28. Mayer does not dispute data establishing that he engaged in at least thirty-two (32) "wash sales" of East Delta common stock between February 2004 and May 2006. Pl. Ex. 334; Trial Trans. at 26:15-29:8.

29. Mayer does not dispute data establishing that, on multiple occasions, he and Knapp submitted "matched" orders of East Delta common stock. Pl. Ex. 335; Trial Trans. at 29:9-31:12.

30. Mayer does not dispute telephone records demonstrating that he communicated with an East Delta market maker named Public Securities at various times during late 2004. Pl. Ex. 325; Trial Trans. at 52:18-55:2.

31. Mayer testified at his deposition that it was "possible" that he had told a Public Securities employee named John Hull ("Hull") that "if [Hull] purchased a block of East Delta stock at a specific price that [he] would make sure that [Hull] could sell it for a profit." Pl. Ex. 292 at 185:21-186:3.

II.   Mayer Amsel's Liability Under Section 5: Conclusions of Law

   A.   Legal Standard

The SEC's remaining claim against Mayer alleges violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c).

"Section 5 requires that securities be registered with the SEC before any person may sell or offer to sell such securities." SEC v. Cavanagh, 445 F.3d 105, 111 (2d Cir. 2006) (citing 15 U.S.C. § 77e). "To state a cause of action under Section 5, one must show '(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Id. at 111 n. 13 (quoting Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 n. 4 (2d Cir. 1998); see also SEC v. Opulentica, LLC, 479 F.Supp.2d 319, 328-29 (S.D.N.Y. 2007). "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." Id. (citing SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953)).

"Liability for violations of Section 5 extends to those who have 'engaged in steps necessary to the distribution of [unregistered] security issues.'" SEC v. Universal Express, Inc., 475 F.Supp.2d 412, 422 (S.D.N.Y. 2007). "An indirect participant, who has not himself passed title to an unregistered security, may nevertheless be liable for its offer or sale." Id. "The necessary participant test . . . essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place – in other words, whether the defendants' acts were a substantial factor in the sales transaction." Id. (internal quotation marks and citation omitted). "A plaintiff need not also show scienter to prove a Section 5 violation." Id. (citing cases).

7

B.  Application

Plaintiff has clearly established the second and third elements of a Section 5 violation. Plaintiff's evidence demonstrates that Mayer offered or sold his shares of East Delta, and that he did so through use of interstate transportation or communication and the mails. See, e.g., Exs. 18, 184, 274, 275, 277, 284, 301, 302, 334, 335; see also Pl. Ex. 292 at 46:12-17 (noting that shares were transferred to Knapp in return for services).

Plaintiff has also established that the securities at issue lacked a registration statement. The August 30, 2004 S-8 form did not serve as the requisite registration statement for two (2) reasons.

"Form S-8 allows a company to offer shares of its stock to consultants through its employee benefits program, so long as (1) the consultants are natural persons; (2) the consultants provide bona fide services to the company; and (3) the services are not in connection with the offer or sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the registrant's securities." SEC v. Ramoil Mgmt., Ltd., No. 01 Civ. 9057, 2007 WL 3146943, at *11 (S.D.N.Y. Oct. 25, 2007); see also SEC v. Phan, 500 F.3d 895, 903 (9th Cir. 2007) ("SEC regulations provide that an S-8 registration form can be used by a company only to issue stock as a means of compensating consultants for bona fide services not connected with raising capital."); Registration of Securities on Form S-8, SEC Releases No. 33-7646, 34-41009, 1999 WL 94588 (S.E.C. Feb. 25, 1999). Not only did Mayer Amsel fail to provide "bona fide" consulting services to East Delta, but any services that he did perform were for the primary purpose of promoting and maintaining a market for East Delta securities.

First, there is no question that Mayer did not perform the consulting services as outlined in the Agreement. At most, he claims to have been directly or indirectly involved in referring a handful of individuals to East Delta, some of whom entered into their own consulting agreements with the company. His rather limited role in making these introductions ended a mere two (2) months into his two (2)-year term. Trial Trans. at 111:25-114:18.

Defendant's testimony that the Agreement was orally amended to redefine his role and to limit his term of service, id. at 121:9-122:12, is not credible. Not only is this version of events unsupported by any evidence, but such an amendment would have directly violated the terms of the Agreement. Pl. Ex. 146 at Article 10.7 ("This Agreement may not be modified, supplemented, or amended . . . except upon the execution and delivery of a written agreement signed by the authorized representative of each party.").

Second, Mayer's work served the primary purposes of raising capital and promoting a market for East Delta securities. Form S-8 may not be used to register securities issued as compensation for consulting services when that consultant's role is primarily capital-raising or promotional. See Registration of Securities on Form S-8, SEC Releases No. 33-7646, 34-41009, 1999 WL 95488, at *7 (S.E.C. Feb. 25, 1999). Eligibility does not depend on "the person's title," but "will depend on the *primary character* of the services provided." Id. (emphasis added).

The "primary character" of Mayer's role was capital-raising and promotional. Although he also performed some limited recruitment functions, Mayer's primary role was the promotion of East Delta stock. Trial Trans. at 118:7-16. On a number of occasions between February 2004

9

and May 2006, Mayer executed "matched orders"[2] and participated in "wash sales"[3] that had the effect of maintaining a market for East Delta. See Pl. Exs. 334, 335. Indeed, there were days on which Mayer and David were responsible for all of the East Delta trading volume. Trial Trans. at 78 (Plaintiff Expert Cangiano: "So if you remove this activity from what I consider the free force of supply and demand, I think it would paint a very different picture of what the market would value East Delta at.").

Mayer also testified that he worked with various East Delta stock promoters, including Bernie Meier and Chris Knapp, and that he transferred one hundred fifty thousand (150,000) shares to Knapp in exchange for Knapp's services. Pl. Ex. 292 at 44:17-46:17. Furthermore, telephone records indicate that Mayer was in frequent contact with Hull, a market maker at Public Securities. Pl. Ex. 325. Although his testimony was equivocal, he recognized that it was "possible" that he assured Hull that purchasing a block of East Delta securities would be profitable. Pl. Ex. 292 at 185:15-187:11.

Accordingly, the August 30, 2004 Form S-8 registration statement is rendered void, and cannot serve as the registration statement specified in Section 5. See Ramoil, 2007 WL 3146943,

---

[2] "'Matched' orders are orders for the purchase sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." Ernst & Ernst v. Hochfelder, 435 U.S. 185, 205 n. 25, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). "[M]atched orders are prohibited only when they are '[f]or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security.'" Jay Dees, Inc. v. Defense Tech. Sys., Inc., No. 05 Civ. 6954, 2008 WL 4501652, at *4 (S.D.N.Y. Sept. 30, 2008) (quoting 15 U.S.C. § 78i(a)(1)).

[3] Wash sales are defined as "transactions involving no change in beneficial ownership." Ernst & Ernst, 425 U.S. at 205 n. 25; 96 S.Ct. 1375.

at *10-11 (when Form S-8 found to be fraudulent, "no registration was in effect for the securities that [defendant] offered"). The SEC has proven by a preponderance of the evidence that Mayer Amsel violated Sections 5(a) and 5(c) of the Securities Act. Moreover, Mayer has not shown the applicability of any exemption. See Ralston Purina, 346 U.S. at 126; 73 S.Ct. 981.

The SEC also seeks an order permanently enjoining Mayer Amsel from committing future violations of Section 5. "An injunction prohibiting a party from violating statutory provisions is appropriate where 'there is a likelihood that, unless enjoined, the violations will continue.'" SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1477 (2d Cir. 1996). "Such an injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted . . . ." Id. (internal quotation marks and citation omitted).

The Court finds that, in the absence of an injunction, there is a likelihood of future violations. Mayer's Section 5 violation was not an isolated occurrence, but was part of an ongoing pattern of activity that occurred over several years. He has been sanctioned by regulatory bodies on several occasions, by the National Association of Securities Dealers in 1995 and by the SEC in 1998. See Docket Entry No. 91 at 23. Furthermore, there is no evidence that Mayer has recognized or taken responsibility for his actions, as he continues to claim that "there was no wrongdoing." Docket Entry No. 98 at 2. Plaintiff's request for a permanent injunction is therefore granted.

III.  Penalties

The Court now turns to the SEC's application for disgorgement, prejudgment interest, civil penalties against David and Mayer Amsel, and a permanent officer and director bar as to David Amsel.

A.  Disgorgement

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." First Jersey, 101 F.3d at 1474. "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." Id. "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." Id. at 1474-75. "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation; any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." Id. at 1475 (internal citations and quotation marks omitted).

Defendants oppose the imposition of this remedy, arguing principally: (1) that "there was no wrongdoing," and (2) that plaintiff's calculation of their profits is "exaggerated." See Docket Entry No. 97 at 2; Docket Entry No. 98 at 2. The Court rejects the first argument for the reasons set forth herein and in the Court's March 22, 2011 summary judgment order.

The SEC has submitted evidence demonstrating that David and Mayer's gross profit from

trading East Delta stock between January 2004 and December 2006 was $1,322,703.46. Declaration of Colin Rand ("Rand Decl.") [Docket Entry No. 96-2] at Exs. A, B, C. After subtracting broker commissions, the Amsels' net profit amounted to $963,780.46. Id.; see also Docket Entry No. 96 at 5, n. 3.

Since the Amsels should not be permitted to benefit from their ill-gotten gains, an order of disgorgement is warranted. However, broker commissions should be deducted from the total amount. "Courts in this Circuit consistently hold that a court may, in its discretion, deduct from the disgorgement amount any direct transaction costs, such as brokerage commissions, that plainly reduce the wrongdoer's actual profit, but they have taken care to distinguish such costs from general business expenses, such as overhead expenses, which should not reduce the disgorgement amount." SEC v. Universal Express, Inc., 646 F.Supp.2d 552, 564 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). Disgorgement "is not a penalty assessment, but merely a means of divesting a wrongdoer of ill-gotten gains." SEC v. Shah, 92 Civ. 1952, 1993 WL 288285, at *5 (S.D.N.Y. July 28, 1993). By ordering a defendant to disgorge an amount equal to the broker commissions, defendant would effectively be forced to pay the commission a second time. Id.; see also SEC v. McCaskey, No. 98 Civ. 6153, 2002 WL 850001, at *4 (S.D.N.Y. Mar. 26, 2002).

As the court put it in Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc., 734 F. Supp. 1071, 1077 (S.D.N.Y. 1990):

> To require disgorgement of all fees and commissions without permitting a reduction for associate expenses and costs constitutes a penalty assessment and goes beyond the restitutionary purpose of the disgorgement doctrine. Therefore, transaction costs such as brokerage commissions incurred by [defendant] in executing trades in [the company's] securities should be deducted from any fees

13

and commissions disgorged as profit.

Although an order of disgorgement is appropriate, the Court declines to add the amount of defendants' brokerage commissions to the award. Accordingly, the Court orders disgorgement in the amount of **$963,780.46**, an amount for which David and Mayer Amsel will be held jointly and severally liable. See SEC v. AbsoluteFuture.com, 393 F.3d 94, 97 (2d Cir. 2004).

B. Prejudgment Interest

The same rationale for disgorgement weighs in favor of an order of prejudgment interest. "[D]isgorgement and prejudgment interest flow from the principle that, as between one who has broken the law and the authorities charged with enforcing it, the lawbreaker should not be able to retain the fruits of the violation." SEC v. Elliott, No. 09 Civ. 7594, 2011 WL 3586454, at *12 (S.D.N.Y. Aug. 11, 2011). "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). "The interest rate generally used to calculate disgorgement interest is the IRS's underpayment rate." SEC v. Shehyn, No. 04 CV 2003, 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010).

The SEC requests prejudgment interest in the amount of $447,005.74, calculated using the IRS underpayment rate through April 30, 2011. See Rand Decl. at ¶ 10. However, the $447,005.74 figure was calculated using a disgorgement amount of $1,322,703.46, which included defendants' broker commissions. Since the Court's order of disgorgement excludes broker commissions, the SEC's request for prejudgment interest should be revised accordingly.

14

As further set forth below, plaintiff shall submit a proposed judgment to the Court by Friday, September 14, 2012, which shall include a revised request for prejudgment interest. Interest shall be calculated through May 30, 2011, the date on which plaintiff's post-trial motions were fully briefed.

### C. Civil Penalties

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d)(1), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), authorize the imposition of civil monetary penalties. "The statutes provide that the maximum penalty is the greater of the figure reached under either the statutes' per-violation or gross pecuniary gain prongs." SEC v. Pentagon Capital Mgmt. PLC, No. 08 Civ. 3324, 2012 WL 1036087, at *2 (S.D.N.Y. Mar. 28, 2012). "Under the per-violation prong, the penalty is calculated by multiplying the number of violations by a dollar amount provided by statute; under the other, second prong, the figure is the gross amount of pecuniary gain." Id. (citing cases).

"The statutory maximum for the per-violation approach is determined by a three-tiered system." Id. The SEC seeks imposition of the more severe Tier II and Tier III penalties against both defendants, totaling $715,000.00 for David Amsel and $455,000.00 for Mayer Amsel.[4] Docket Entry No. 96 at 10.

Tier II penalties are appropriate upon a showing of "fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement." SEC v. Kern, 425 F.3d 143, 153

---

[4] Although plaintiff's brief requests a total of $780,000.00 in penalties against David Amsel and $520,000.00 against Mayer Amsel, Docket Entry No. 96 at 10, the Court believes this to be a calculation error.

15

(2d Cir. 2005) (quoting 15 U.S.C. § 77t(d)(2)(B)); see also 15 U.S.C. § 78u(d)(3)(B)(ii). The imposition of Tier III penalties requires those Tier II elements plus "substantial losses or . . . significant risk of substantial losses to other persons." Id. (quoting 15 U.S.C. § 77t(d)(2)(C)); see also 15 U.S.C. § 78u(d)(3)(B)(iii); SEC v. Razmilovic, 822 F.Supp.2d 234, 279 (E.D.N.Y. 2011). "In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." SEC v. Opulentica, LLC, 479 F.Supp.2d 319, 331 (S.D.N.Y. 2007) (citing cases). "While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" Id. (quoting Moran, 944 F. Supp. at 296-97).

Plaintiff first seeks Tier III penalties in the amount of $130,000.00 for each of the defendants' violations of Section 17(a), Section 10(b), and Rule 10b-5 (*i.e.*, a $390,000.00 Tier III penalty for each defendant).[5] By manipulating the market activity of East Delta stock, defendants' conduct created a false impression of demand for that stock and placed the investing public at risk. The Court views this to be a serious violation of the law. See generally Reddy v. CFTC, 191 F.3d 109, 124 (2d Cir. 1999) (calling artificial trades "extremely serious"). The wash

---

[5] This is the maximum Tier III penalty for violations that occurred after February 14, 2005 and on or before March 3, 2009. 17 C.F.R. § 201.1003; 17 C.F.R. Pt. 201, Subpt. E, Tbl. III; 17 C.F.R. § 201.1004; 17 C.F.R. Pt. 201, Subpt. E, Tbl. IV.

16

sales and matched orders that were intended to manipulate the price of East Delta shares occurred over the course of several years; this was an ongoing pattern of activity and demonstrates a high degree of scienter. Although defendants' gross profit exceeded one million dollars, they continue to dispute that they made any money from the scheme or that they even committed any violation of the law. Docket Entry Nos. 97, 98.

Defendants' conduct certainly involved "fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement." Although plaintiff does not attempt to quantify the amount of loss to others, defendants' activities had the effect of raising East Delta's share price for the investing public. Thus, the Court finds that defendants' conduct, at minimum, "directly or indirectly . . . created a significant risk of substantial losses to other persons." See McCaskey, 2002 WL 850001, at *13 (defendant who manipulated stock in order to "stabilize" its price created "significant risk of substantial loss" when stock sold to investing public). Accordingly, the SEC's application for Tier III penalties in the amount of $390,000.00 as to each defendant is granted.

Second, plaintiff seeks four (4) maximum Tier II penalties, totaling $260,000.00, against David Amsel for his violations of Section 13(a) of the Exchange Act, Rule 12b-20, Rule 13a-1, and Rule 13a-13. Docket Entry No 96 at 10. For the reasons set forth in the Court's March 22, 2011 summary judgment order, plaintiff has demonstrated that David Amsel aided and abetted East Delta's violations of Section 13(a) and related rules, and that the actions were taken with, at minimum, a "deliberate or reckless disregard of a regulatory requirement." Thus, the Court will impose the maximum Tier II penalties against David Amsel for each of the four (4) provisions found to have been violated.

17

Third, plaintiff seeks Tier II penalties in the amount of $65,000.00 against each defendant for their respective violations of Section 5 of the Securities Act. Docket Entry No 96 at 10. For the reasons set forth above, the Amsels' violations of Section 5 were, at minimum, committed with a "deliberate or reckless disregard of a regulatory requirement." The Court therefore imposes a maximum Tier II penalty of $65,000.00 against each defendant for each Section 5 violation.

In sum, the Court imposes civil monetary penalties against both defendants as follows.

Tier III penalties in the amount of $390,000.00 against David Amsel and Tier III penalties in the amount of $390,000.00 against Mayer Amsel, for each defendant's violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

Tier II penalties in the amount of $260,000.00 against David Amsel for his violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13.

Tier II penalties in the amount of $65,000.00 against David Amsel and Tier II penalties in the amount of $65,000.00 against Mayer Amsel for each defendant's violations of Section 5 of the Securities Act.

D. Permanent Officer and Director Bar

Finally, the SEC seeks a permanent officer and director bar against David Amsel. Docket Entry No. 96 at 12-17.[6]

Pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), the Court may "prohibit, conditionally or

---

[6] Plaintiff does not seek any officer or director bar against Mayer Amsel.

unconditionally, and permanently or for such period of time as it shall determine, any person" who has violated Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act from serving as an officer or director of a publicly held company "if the person's conduct demonstrates unfitness to serve . . . ." The Second Circuit has noted that the following factors are "useful" in determining whether a defendant "demonstrates unfitness to serve as an officer or director" of a public company: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995) (internal quotation marks omitted); see also SEC v. iShopNoMarkup.com, Inc., No. 04-CV-4057, 2012 WL 716928, at *3 (E.D.N.Y. Mar. 3, 2012). "[B]efore imposing a permanent bar, the court should consider whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient . . . ." Patel, 61 F.3d at 142. "[I]t is not essential for a lifetime ban that there be past violations." Id. However, "in the absence of such violations, [it is essential] that a district court articulate the factual basis for a finding of the likelihood of recurrence." Id.

As set forth above, David Amsel's violations are serious. He admitted to matching orders with Mayer in order to prop up East Delta's share price, even as he apparently understood that his conduct was unlawful. Moreover, David Amsel played a significant role at East Delta and gained financially from his conduct.

However, plaintiff has not provided any evidence of past violations, nor has it presented sufficient evidence to persuade the Court that a lifetime bar is appropriate. The Court believes

19

that an eight (8)-year bar is sufficient in this case. The bar will begin to run from the date of entry of this order. See generally SEC v. McCaskey, No. 98 CIV. 6153, 2001 WL 1029053, at *6-7 (S.D.N.Y. Sept. 6, 2001) (imposing six (6)-year bar on individual who manipulated public stock through matched orders and wash sales).

III. Conclusion

For the foregoing reasons, plaintiff has proven by a preponderance of the evidence that Mayer Amsel committed violations of Sections 5(a) and 5(c) of the Securities Act. Mayer Amsel is permanently enjoined from violating those statutes.

David Amsel is barred from serving as an officer or director of a publicly held company for a period of eight (8) years from the date of entry of this order.

The Court also awards disgorgement, prejudgment interest, and civil monetary penalties in the amount indicated above. The SEC shall file a proposed judgment consistent with this order by **Friday, September 14, 2012**.

**IT IS SO ORDERED.**

s/ Sandra J. Feuerstein
Sandra J. Feuerstein
United States District Judge

Dated:   August 31, 2012
         Central Islip, New York

20